## SOUTHWESTERN BELL TELEPHONE CO. v. CITY OF FT. SMITH.

(District Court, W. D. Arkansas, Ft. Smith Division. September 17, 1923.)

### No. 407.

1. **Telegraphs and telephones ⬅️➡️33(1)—Going value proper element in rate case.**
   Going value is a proper element to be considered in making rates for telephone services.

2. **Telegraphs and telephones ⬅️➡️33(1)—Method of valuation held not to capitalize losses.**
   Method followed in valuation for purposes of fixing telephone service rates *held* not to capitalize past losses.

⬅️➡️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Constitutional law** ⊜⇒298(4).—**Rates not sufficient to yield reasonable return confiscatory.**

Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility of its property, in violation of the Fourteenth Amendment.

4. **Telegraphs and telephones** ⊜⇒33(1)—**Valuation of property for rate purposes.**

In ascertaining the present value of property for purposes of telephone service rates, court is not limited to the consideration of the amount of the actual investment, and contention that in determining present value prices should be considered as of the date when the particular items were purchased was without merit.

5. **Telegraphs and telephones** ⊜⇒33(1)—**Necessary reserve for depreciation determined by public utility.**

Until the interstate Commerce Commission, through pending investigations, shows amount reserved for depreciation by telephone company to be excessive, prudence would dictate that the judgment of the company on that point should be permitted to stand; the percentage allowed for depreciation by the company not being unusual.

In Equity. Suit by the Southwestern Bell Telephone Company against the City of Ft. Smith to enjoin putting into effect ordinance rates for service. Preliminary injunction made permanent.

Hill & Fitzhugh, of Ft. Smith, Ark., E. W. Clausen and Claude Nowlin, both of St. Louis, Mo., and E. B. Downie, of Little Rock, Ark., for plaintiff.

Pryor & Miles, of Ft. Smith, Ark., for defendant.

YOUMANS, District Judge. This is a suit by the plaintiff telephone company against the city of Ft. Smith to enjoin putting into effect certain ordinance rates for telephone service. The allegation upon which relief is sought by the plaintiff is that the ordinance rates are confiscatory.

The engineers of each side have testified and have introduced exhibits tending to sustain the respective contentions. The first thing sought to be determined is the present value of the property devoted to the public service. There is no dispute as to original cost. There is also no dispute with reference to depreciation, except that the city engineers contend that the engineers for the company did not take into consideration "hidden depreciation" and did not make sufficient allowance for age.

The contention on behalf of the company is that the greatest factors to be considered in determining depreciation are inadequacy and obsolescence. For the city it is contended that in determining a rate, going value should not be taken into consideration. It is admitted by the city that going value is a proper element to be considered for the purpose of purchase and sale of a given utility.

The case of National Waterworks Co. v. Kansas City, 62 Fed. 853, 10 C. C. A. 653, 27 L. R. A. 827, was a case of sale. In that case the court said:

"We have before us the estimate placed by two gentlemen of experience and capacity, appointed as commissioners, with direction to report 'the fair and

equitable value'; but neither by the order of the court appointing them, nor by their report, are we advised as to what they consider a criterion of the present 'fair and equitable value.' If they added anything beyond what in their judgment was the reasonable cost of reproduction, we are not advised as to how much they added, or what they took into consideration in making such addition. We have the fact of liens placed upon the property, to the extent of $3,000,000, with the qualified approval of the city officials. We have also the statement of the earnings, and the estimate of the value upon the basis of a capitalization of those earnings, amounting, as stated, at 6 per cent., to $4,500,000. Rejecting the latter as too high, and the cost of reproduction as too low, and taking into consideration the entire history of the transactions between the company and the city, from its commencement to the present time, we have sought to place a value upon the property as it stands, with all the connections already made between the pipes and the private and public buildings, and with the work which it is in fact doing of supplying all these buildings with water, and receiving pay therefor. That valuation, after much discussion, comparison of figures, and readjustments, we have all agreed, is $3,000,000.  *  *  *"

In the case of Cleveland, etc., Ry. Co. v. Backus, 154 U. S. 444, 14 Sup. Ct. 1122, 38 L. Ed. 1041, the court said:

"The true value of a line of railroad is something more than an aggregation of the values of separate parts of it operated separately. It is the aggregate of those values plus that arising from a connected operation of the whole, and each part of the road contributes not merely the value arising from its independent operation, but its mileage proportion of that flowing from a continuous and connected operation of the whole. This is no denial of the mathematical proposition that the whole is equal to the sum of all its parts, because there is a value created by and resulting from the combined operation of all its parts as one continuous line. This is something which does not exist, and cannot exist, until the combination is formed."

In the case of City of Omaha v. Omaha Water Co., 218 U. S. 180, 202, 30 Sup. Ct. 615, 620 (54 L. Ed. 991, 48 L. R. A. (N. S.) 1084, the court said:

"The value in equity and justice must include whatever is contributed by the fact of the connection of the items making a complete and operating plant. The difference between a dead plant and a live one is a real value, and is independent of any franchise to go on, or any mere good will as between such a plant and its customers. That kind of good will, as suggested in Willcox v. Consolidated Gas Co., 212 U. S. 19, is of little or no commercial value when the business is, as here, a natural monopoly, with which the customer must deal, whether he will or no. That there is a difference between even the cost of duplication, less depreciation, of the elements making up the water company plant, and the commercial value of the business as a going concern, is evident. Such an allowance was upheld in National Waterworks v. Kansas City, 62 Fed. 853, where the opinion was by Mr. Justice Brewer. We can add nothing to the reasoning of the learned justice, and shall not try to."

In the case of Des Moines Gas Co. v. Des Moines, 238 U. S. 165, 35 Sup. Ct. 811, 59 L. Ed. 1244, a rate case, the court said:

" 'Going value,' or 'going concern value,' i. e., the value which inheres in a plant where its business is established, as distinguished from one which has yet to establish its business has been the subject of much discussion in rate-making cases before the courts and commissions. Many of those cases are collected in Whitten on Valuation of Public Service Corporations, §§ 550–569, and the supplement to the same work, §§ 1350–1385. That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element

of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use."

In the case of Bluefield Waterworks & Improvement Co. v. Public Service Commission of the State of West Virginia et al., 43 Sup. Ct. 675, 67 L. Ed. 1176, decided by the Supreme Court of the United States June 11, 1923, a going value of 10 per cent. had been allowed by the state court, the decision of which was being reviewed. In the case of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Com. of Missouri, 43 Sup. Ct. 544, 67 L. Ed. 981, decided May 21, 1923, by the Supreme Court of the United States, one large item of value the cost of establishing business. That is what the plaintiff claims is going value.

The city relies upon the decision in the case of Galveston Electric Co. v. City of Galveston et al., 258 U. S. 388, 42 Sup. Ct. 351, 66 L. Ed. 678. In that case Mr. Justice Brandeis, speaking for the court, said:

"The going concern value for which the master makes allowance is the cost of developing the operating railway system into a financially successful concern. The only evidence offered, or relied upon, to support his finding is a capitalization of the net balance of alleged past deficits in accordance with what was said to be the Wisconsin rule."

After discussing the items taken into consideration by the master in arriving at going value, Mr. Justice Brandeis said:

"Going concern value and development cost, in the sense in which the master used those terms, are not to be included in the base value for the purpose of determining whether a rate is confiscatory."

[1] The opinion in that case does not sustain the contention that going value should not be considered in a rate case. The decision in the case of Des Moines Gas Co. v. Des Moines was neither modified nor overruled by the decision in the Galveston Case. The conclusion must be that going value is a proper element to be considered in a rate case. It is proper to state that this conclusion is opposed to the conclusion in the case of Jacksonville Gas Co. v. City of Jacksonville (D. C.) 286 Fed. 404.

The valuation engineer of the plaintiff prepared and introduced an exhibit in which he stated how the cost of establishing the business was arrived at, as follows:

"In order to determine the going concern value of the plant at Ft. Smith, a detail estimate of the cost of establishing the business has been made; in other words, the cost of putting the dormant physical plant into active going condition. This estimate covers only those costs incident to establishing the business, such as attaching the subscribers; training the organization necessary for the proper handling of the business; preparing the records, necessary for conducting the business; maintenance and depreciation on the idle plant from the time of completion of various elements of plant until put into service; and taxes and interest on the idle plant after the exchange opens until all the plant is in service. This estimate of the cost of establishing the business, or making a going concern out of a dead physical plant, does not duplicate any portion of the cost of reproducing the physical property or any other costs included in the appraisal, and is predicated on the following:

"(1) That the plant would be built in the most economical period of time. The construction period from the beginning of construction until the last subscriber was attached, would cover a total of four years.

"(2) That the exchange would be opened as soon as it is physically ready, in order to receive the revenue then available; in this case at the end of the second year.

"(3) That it would be uneconomical to postpone the opening of the exchange until all the subscribers could be attached.

"(4) That it would be uneconomical and impractical to open the exchange until 60 per cent. of the stations were connected and cut into service simultaneously.

"(5) That the remaining 40 per cent. of the subscribers would be secured gradually within two years after the exchange was opened.

"(6) That the most economical construction program would be to build all the plant of sufficient initial capacity to care for the full number of subscribers now attached (except the station equipment and drop wires for those stations connected after the exchange is opened). The initial plant would be completed before the exchange opened or during the first two years. The station equipment and drop wire for the stations connected after the exchange is opened would be placed as needed.

"(7) That this program of placing the plant and connecting the subscribers would necessarily result in a certain percentage of the plant remaining idle for a period of time.

"(8) That the revenue obtained for service after the exchange opened would be sufficient to cover operating expenses, including carrying charges and return upon that portion of plant actually in service. but would be insufficient to defray any part of the carrying charges on the idle plant. For the purpose of this study, no consideration has been given to any possible operating deficit during this period, although analyses show that the revenue derived from such limited operation are almost always insufficient to cover even the above enumerated expenses of plant in service. However, such a deficit has been disregarded in calculating the cost of establishing the business.

"Summary.

| | |
|---|---:|
| 1. Cost of attaching subscribers | $ 12,540 |
| 2. Cost of training employees or building up organization | 7,985 |
| 3. Cost of records | 3,500 |
| 4. Administration (10 per cent. of lines 1, 2, and 3) | 2,403 |
| 5. Cost of maintenance and depreciation on idle plant | 69,038 |
| 6. Interest on above costs, before exchange opens | 2,984 |
| 7. Interest and taxes on idle plant after exchange opens | 16,555 |
| Total | $115,005" |

[2] The method followed in the foregoing quotation is not subject to the criticism made by the Supreme Court in the Galveston Case. The above method does not undertake to capitalize past losses. It assumes a reconstructed plant without business, and gives the cost of securing business of the character and magnitude the company now has in Ft. Smith.

[3] The city also contends that a rate may not be fair, so as to afford to the utility an adequate return; but such fact does not render it confiscatory. In the Bluefield Case, above referred to, the court said:

"Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment."

Therefore this contention of the city cannot be sustained.

[4] The city also contends that in determining present value prices should be considered as of the date when the particular items were purchased. In the Minnesota Rate Cases, 230 U. S. 454, 33 Sup. Ct. 762, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, the court said:

"It is clear that in ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost."

This view is restated in the Bluefield Case, and also in the case of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Com. of Missouri, above cited. The amount deducted by the company annually for depreciation equals 5½ per cent. of the value of the plant as fixed by it. The city contends that this is too high, and that it should not exceed 4 per cent.

Pursuant to the act of Congress, the Interstate Commerce Commission has prescribed a uniform system of accounts for telephone companies. In that system the following rules have been formulated with reference to depreciation of plant and equipment:

"Telephone companies should include in operating expenses depreciation charges for the purpose of creating proper and adequate reserves to cover the expenses of depreciation currently accruing in the tangible fixed capital. By expense of depreciation is meant—

"(a) The losses suffered through the current lessening in value of tangible property from wear and tear (not covered by current repairs).

"(b) Obsolescence, or inadequacy resulting from age, physical change, or suppression by reason of new inventions and discoveries, changes in popular demand, or public requirements; and

"(c) Losses suffered through destruction of property by extraordinary casualties.

"The amount charged as expense of depreciation should be based upon rules determined by the accounting company. Such rules may be derived from a consideration of the company's history and experience. Companies should be prepared to furnish the Commission, upon demand, the rules and a sworn statement of the facts, expert opinions, and estimates upon which they are based. The estimate for depreciation of physical property should take into account—

"(a) The gradual deterioration and ultimate retirement of units of property which may be satisfactorily individualized, such as buildings, machines, valuable instruments, etc., to the end that by the time such units of property go out of service there shall have been accumulated a reserve equal to the original money cost of such property plus expenses incident to retirement less the value of any salvage.

"(b) The depreciation accruing in property which can not be readily individualized, such as pole lines, wires, cables, or other continuous structures, where expenditures for repairs or replacements of individual parts ordinarily are not actually made until the later years of the life in service of such property, and, when made, may therefore be classed as extraordinary repairs.

"The rate of depreciation should be fixed so as to distribute, as nearly as may be, evenly throughout the life of the depreciating property the burden of repairs and the cost of capital consumed in operations during a given month or year, and should be based upon the average life of the units comprised in the respective classes of property."

The amount so reserved is left to the judgment of the company subject to the rules above quoted. From the testimony it appears that a rate of 5½ per cent. for depreciation is not unusual. It also appears from the testimony that the Interstate Commerce Commission is now making an investigation of the rate of reserve for depreciation of telephone companies, and has not reached a conclusion upon that point.

[5] While the city may prescribe rates for telephone service, it is not the owner of the telephone plant. The telephone company is the owner of the plant and operates it. Its officers and employees are charged with the responsibility of its operation. Their experience enables them to form a judgment with reference to the amount to be reserved for depreciation. Until the Interstate Commerce Commission through its investigation shows the amount reserved by the company to be excessive, prudence would dictate that the judgment of the company upon that point should be permitted to stand.

By allowing a valuation of $685,605, which includes a going value of 10 per cent., and by reducing the annual depreciation to 4 per cent., the city shows a return of 6.29 per cent. Its engineer admits that a fair return would be 8 per cent. The attempt to impose ordinance rates which admittedly will not produce a 'fair return on the value of the property devoted to public use is the taking of property without due process of law under the Fourteenth Amendment. Therefore the preliminary injunction will be made permanent.