THE STATE EX REL. CITY OF ST. JOSEPH, Appellant, v. PUBLIC SERVICE COMMISSION; ST. JOSEPH WATER COMPANY, Intervener.—30 S. W. (2d) 8.

Court en Banc, June 3, 1930.

*R. M. Duncan, W. B. Norris, Jr.,* and *Harry J. Cooney* for appellant; *John C. Landis, Jr.,* for School District of St. Joseph of counsel.

212

*D. D. McDonald* for respondent; *W. R. Voorhis, C. H. Dickey* and *R A. Brown* for Intervener.

FRANK, J.—This is an appeal from a judgment of the Circuit Court of Cole County, approving an order of the Public Service Commission fixing the value of the property of the St. Joseph Water Company for rate-making purposes at $3,821,312.36 and approving a schedule of rates which would yield a net return of approximately eight per cent on the value so fixed. The Commission denied a rehearing of this order, and the cause was removed to the Circuit Court of Cole County, where the order of the Commission was affirmed, and the city of St. Joseph appealed.

A former rate hearing was had in 1923, in which the Commission at that time fixed the value of the water company's property for rate-making purposes as of March 31, 1923, at $3,125,000. On application of the city the cause was removed to the circuit court for the purpose of reviewing the order of the Commission. Subsequently, and while that cause was pending in the circuit court, the city petitioned the Commission asking that the water company be required to make extensive additions and improvements to its plant. After the city's petition for additions and improvements was filed with the Commission, the city and the water com-

pany entered into an agreement by the terms of which it w'as agreed that the city would dismiss its pending proceedings to review the order of the Commission, the water company would make the additions and improvements called for, and the value of the water company's property fixed by the Commission at $3,125,000 as of March 31, 1923, should remain in full force and effect as of that date. Following this agreement the city dismissed the proceedings wherein it sought a review of the Commission's order, and the water company made additions and improvements to its plant at a cost of $793,745.36.

After these improvements were made, the present proceedings were instituted before the Commission by the water company in which it asked that the cost of the improvements, less property abandoned since 1923, be added to the rate base of $3,125,000 as fixed by the Commission in 1923, and a schedule of rates be approved that would yield a net return of eight per cent on the value of the plant after the improvements were made.

The value of the property was fixed in the present proceedings as of August 11, 1925. In fixing this value, the Commission did not revalue the property as it stood before the improvements were made, but used as a basis the value of $3,125,000 which it had theretofore fixed as March 31, 1923, and added thereto the sum of $696,312.36, being the cost of improvements, less property abandoned since 1923, thus fixing the value of the plant as of August 11, 1925, at $3,821,312.36.

Before passing to a discussion of the merits of the case, it is necessary to dispose of two contentions made by appellant, (1) that the order of the Commission fixing the value of the property as of March 31, 1923, at $3,125,000, was not *res adjudicata*, and (2) that the agreement of the city to the effect that such order should remain in full force and effect was not binding on the Commission and would not prevent the Commission from revaluing the property.

It is true that the value of the property fixed as of March 31, 1923, was not conclusive on the Commission in the present proceedings. The authority of the Commission to fix the value of the property of a public utility for rate-making purposes is a continuing power. If, in the judgment of the Commission, it used the wrong method in arriving at the former valuation, or reached a wrong conclusion therein, it had authority in the present proceedings to consider a revaluation of the property unembarrassed by the former valuation. However, the fact that the Commission had authority to revalue the property which it had recently valued, does not mean that it should have done so unless some useful purpose would have been served by so doing. If, on the showing made, the Commission was warranted in concluding that its former valuation of $3,125,000 was correct as of the date when made, and

that nothing had happened since the fixing of that value, such as withdrawals of property, depreciation or appreciation in price levels sufficient to make any material change in the value so fixed, it was justified in refusing to make a revaluation. [State ex rel. S. W. Bell Telephone Co. v. Pub. Serv. Comm. of Missouri, 262 U. S. 276; Virginia Railway & Power Co., P. U. R. 1925C, 213; Dyer v. Virginia Railway & Power Co., 147 Va. 98, 136 S. E. 499.]

In Virginia Railway & Power Co., supra, the railway applied for an increase in rates. The customers asked for a revaluation of the property. The property had been valued two years before. In refusing to revalue the property the Commission said:

"In order, however, for the Commission to be justified in making a revaluation, as distinguished from an original valuation, it would be necessary for the party asking for same to show at least prima-facie, a situation justifying the delay, expense, and incident inconvenience, and the Commission would have to be satisfied from some source that under all the circumstances a revaluation should be made in order to do justice to all concerned, but especially to the general public."

The order of the Commission in the above case reached the Supreme Court of Virginia on appeal. In the disposition of the case that court said:

"Under these circumstances it would have been an improper use of the public funds, so greatly needed for the purposes indicated, to have made such an unnecessary expenditure for the appraisement of this property, which, as has been stated, had been so recently valued for rate-making purposes, and the Commission properly refused to do so." [Dyer v. Virginia Railway & Power Co., 147 Va. 98, 136 S. E. 499.]

It is also true that the city's agreement to accept the former valuation as conclusive was not binding on the Commission. [State ex rel. City of Sedalia v. Public Service Commission, 275 Mo. 201, 211, 204 S. W. 497.] Neither did the Commission so regard it. On the contrary the city was permitted to introduce, over the objection of the water company, all evidence it desired to offer touching the value of the property at and prior to the date of its former valuation, and the method used by the Commission in arriving at such former valuation.

Appellant contends that the Commission should have disregarded the former valuation and revalued the entire property.

It was the duty of the Commission to determine and fix the fair value of the property. If the former valuation did not represent the fair value of the property, as of the date when made, the Commission should have revalued it. On the other hand, if such valuation was a fair one, the Commission was justified in accepting it as a basis or starting point in the case at bar, thus

avoiding the unnecessary expenditure of public funds to make a revaluation when no useful purpose would be served by so doing.

In order to determine whether or not the former valuation of $3,125,000 represented the fair value of the property, it is necessary to know (1) what elements should be considered in fixing the fair value of a utility property for rate-making purposes, and (2) whether or not the former valuation in this case was the result of a consideration of such elements.

There is no fixed rule for determining the fair value of property for rate-making purposes. All facts which shed light on the question must be given due consideration. We call attention to what some of the courts have said on that subject. In State ex rel. Southwestern Bell Telephone Co. v. Public Service Commission et al., 262 U. S. 276, 67 L. Ed. 981, 984, it is said:

"It is impossible to ascertain what will amount to a fair return upon properties devoted to public service without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future values, made upon a view of all relevant circumstances, is essential. If the highly important element of present cost is *wholly disregarded*, such a forecast becomes impossible. Estimates of to-morrow cannot ignore prices of to-day."

The same court in the later case of Standard Oil Company of New Jersey v. Southern Pacific Railroad et al., 69 L. Ed. 890, said:

"It is to be borne in mind that value is the thing to be found, and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."

Again in Southwestern Bell Telephone Co. v. City of Fort Smith, Ark., 294 Fed. 102, 107, that court said:

"It is clear that in ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost."

The above case was affirmed by the Supreme Court of the United States, January 25, 1926.

In the recent case of John McCardle et al. v. Indianapolis Water Co., 272 U. S. 400, it is said:

"And, as indicated by the report of the Commission, it is true that, if the tendency or trend of prices is not definitely upward or downward and it does not appear probable that there will be a substantial change of prices, then the present value of lands, plus the present cost of constructing the plant, less depreciation, if any, is a fair measure of the value of the physical elements of the property."

Many other cases are to the same effect, but the ones cited are sufficient to indicate the trend of thought on the question.

The report of the Commission in the former valuation case (14 P. S. C. 193), to which all parties have made frequent reference, shows that the Commission considered the capital structure of the company, book plant account, inventory of the property, estimated investment in the property, cost of reproduction of the property, capital betterments since inventory, accrued depreciation, working capital, revenues and expenses and going-concern value. This report also shows that various estimates were before the Commission. Mr. Harrop, the chief engineer of the Commission submitted two estimates, one based on a comparison of the price of cast-iron pipe as of May 1, 1923, with the price used in the estimated investment in the property and by that method fixed the reproduction cost less accrued depreciation at $3,255,227; the other was based on an estimated investment of $1,681,970, to which fifty per cent was added to cover increase in prices, then the total was depreciated 27.77 per cent and certain necessary items were added, making the total value of the property $2,310,658.

Engineer Hagenah estimated the reproduction cost, less twenty per cent depreciation, at $3,879,035. The Commission engineers estimated the investment cost of the property to be $2,071,693. There is no evidence that the fifty per cent which engineer Harrop added to the investment cost to cover increase in prices, was sufficient to cover such increase.

The second estimate submitted by Harrop was based on a comparison of the price of cast-iron pipe at different dates. We call attention to the fact that cast-iron pipe is only one of the many factors that enter into the construction of a waterworks plant. Estimates of reproduction cost submitted by engineers Freer and Allison were much higher than the one submitted by Hagenah.

While the Commission did not fix the value of the property at investment cost, such cost was given due consideration. The report, after considering the investment cost of the property, used this language:

"From all of the foregoing, we conclude that the investment in the property is an important factor for consideration in fixing the fair present value."

The report concludes as follows:

"It appears that all estimates submitted by Messrs. Hagenah, Allison and Freer should be adjusted on account of their failure to use actual contract prices in effect at date of investigation, on account of excess allowances for working capital, and on account of failure to deduct full accrued depreciation.

"From all of the evidence herein, we conclude that the fair value of the company's property as of date March 31, 1923, including all elements of property, tangible and intangible, is the sum of $3,125,000."

It appears from the report of the Commission that it gave due consideration to both investment cost and reproduction cost less depreciation, as well as all other factors in connection with the property, and fixed a valuation much less than the estimated reproduction cost, although it was higher than the estimated investment cost. It is our judgment that the Commission followed the proper method in arriving at the valuation of $3,125,000, and there is nothing in the record that would warrant us in finding that it reached the wrong conclusion.

The report of the Commission in the case at bar shows that the Commission examined and considered the method used in arriving at the former valuation. The pertinent part of the report reads as follows:

"The city claims that there has been an appreciable change downward in the value of petitioner's property, while the petitioner claims that there has been no such change. In order to settle this controversy, it will be necessary to briefly outline the method used by the Commission in fixing the valuation of petitioner's property, in Case No. 2520, at $3,125,000, as of date March 31, 1923.

"Mr. Hagenah estimated the cost of reproduction of petitioner's property, as of date February 1, 1922, at $4,946,779, exclusive of working capital and going-concern value. This total was reduced $150,000, plus sixteen per cent to cover construction overhead costs, or a total of $174,000, by reason of the fact that Mr. Hagenah admitted that, had he used actual contract prices of cast-iron pipe at that date, instead of quoted market prices, his estimate would have been reduced by that amount. Additions and betterments from January 1, 1921, to March 31, 1923, in the amount of $49,265, were then added, making the total cost of reproduction of the physical property, as of March 31, 1923, $4,822,044. This latter sum was depreciated twenty per cent, and working capital in the amount of $21,400 was added, making the estimated cost of reproduction less depreciation $3,879,035. The Commission engineers estimated the investment in petitioner's property at $2,045,693, as of date April 1, 1922. To this latter sum, additions to March 31, 1923, in the amount of $26,000, were added, making the total estimated investment, at said date, $2,071,693. This estimated in-

vestment was averaged with the cost of reproduction less depreciation and $150,000 was added to cover going value, making a total of $3,125,000 in round numbers, which sum was fixed as the fair present value of petitioner's property as of date March 31, 1923. There was evidence in said Case No. 2520 of the fact that there was an increase in waterworks commodities subsequent to February 1, 1922; but the Commission gave no consideration to such increase in fixing the value of petitioner's property, for the reason that the Commission was of the opinion that such increases were only temporary. This conclusion is sustained by the evidence, as to price fluctuations, submitted, herein, by petitioner and by the city. The city's exhibits show that current prices are as high or higher than the prices of February 1, 1922. Consequently the Commission would not be justified in reducing the valuation of petitioner's property fixed by it in Case No. 2520.

"Since said valuation was fixed by the Commission, the credits to the depreciation reserve account, which have been borne by the consumers, amount to $73,041, and the credits to plant account and the concurrent charges to the depreciation reserve account, during said period, amount to $90,543.15. In other words, the cost of retiring property during said period exceeds the amount paid into the depreciation reserve by the consumers. In view of this fact and in view of the fact that the Commission previously deducted $964,409, to cover accrued depreciation, and in view of the heavy expenditures for additions and betterments, it does not appear that the condition of petitioner's property as a whole warrants a further reduction for accrued depreciation, at this time."

It appears from this report that the Commission did not treat the former valuation as conclusive, but on the contrary satisfied itself that such valuation represented the fair value of the property, as of the date it was determined, and for that reason refused to revalue it. There is substantial evidence in the record that there was no material change in prices of labor and material between the date of the former and the present valuation.

Appellant contends that the reproduction cost of the property in the former valuation case should have been depreciated twenty-eight per cent instead of twenty per cent as found by the Commission.

The Commission engineers testified that the accrued depreciation in the property was twenty-eight per cent as determined by the "straight line theoretical method." By this method the age of the property is determined by history and inspection, and the probable life from studies and inspection by experienced men. It is assumed that the depreciation is uniform and constant. After the age and probable life of the property is ascertained, a definite rule is obtained whereby the exact amount of depreciation may

be fixed at any particular time. For example, if the property is five years old and its probable life is ten years, the depreciation is fifty per cent. The use of this method would in many cases, lead to unfair results. Take for example two identical plants in use for the same period of time, one efficiently managed, and the property kept in a high state of repair, the other inefficiently managed and the property permitted to run down. It does not appear that the accrued depreciation should be the same in both plants. But if the "straight line theoretical method" is used exclusively for determining such depreciation, it would be exactly the same in both cases. Respectable authorities hold that in determining accrued depreciation, evidence of competent valuation engineers who have examined the property and made estimates regarding its condition is more valuable than calculations based on averages and assumed probabilities. [McCardle et al. v. Indianapolis Water Company, 272 U. S. 400; Pacific Gas & Electric Company v. City and County of San Francisco, 265 U. S. 403; New York Telephone Co. v. Prendergast, 300 Fed. 822; Westinghouse Electric & Mfg. Co. v. Denver Tramway Co., 3 Fed. (2d) 285; Southern Bell Telephone Co. v. Railroad Commission of South Carolina, 5 Fed. (2d) 77; Southwestern Bell Telephone Co. v. City of Fort Smith, 294 Fed. 102.]

Engineer Hagenah testified that he examined or caused to be examined the items of company property; that he observed the state of repair and adaptability of the property, and from such examination and his general knowledge he determined that the reproduction cost of the property should be depreciated approximately nine per cent. In making this inspection only such parts of the water mains that were exposed were examined. Age, and estimated life of property under ordinary conditions are factors to be considered in estimating accrued depreciation, especially so, where, as here, a part of the property was not open to inspection. The age and estimated life of all the major items of the property were before the Commission. It was, therefore, in a position to consider both methods of depreciation. After considering both methods and the evidence relative thereto, the Commission found the accrued depreciation in the property as of March 31, 1923, to be twenty per cent. The record would not justify us in finding that the Commission reached the wrong conclusion as to this item.

It is claimed that the Commission erred in accepting the former valuation of $3,125,000 as a basis without deducting therefrom an amount sufficient to cover accrued depreciation between the dates of the former and the present valuation.

G. W. Biggs, chief engineer for the water company, testified that he was familiar with the property in 1923 and in 1925; that

during this two years the buildings and all parts of the property that could be put in better repair were put in first class condition and that the property was more valuable in 1925 than it was in 1923 on account of its better physical condition. In addition to this evidence, the Commission found that since the former valuation was fixed, the credits to the depreciation reserve account, which were borne by the consumers, amounted to $73,041, and the credit to the plant account and the current charges to the depreciation reserve account during said period, amounted to $90,543.16. In other words, the cost of retiring the property during that period exceeded the amount paid into the depreciation reserve by the customers. There is no evidence that the property was not put in better physical condition by repair during this two year period. The Commission was fixing a fair value of the property in 1925, and where, as here, the evidence warranted a finding that the property was worth as much in 1925 as it was in 1923, it was justified in accepting the 1923 valuation without further depreciation.

The city contends that its Exhibit No. 8 commends itself as a fair method of determining the value of the property as of April 11, 1922.

This exhibit starts with an estimated investment cost of $1,681,970 as of April 1, 1922, from which is subtracted items of property abandoned, leaving the sum of $1,165,272. This sum is appreciated seventy per cent to cover increases in prices, making a total of $2,745,692. This total is depreciated 32.43 per cent (being 27.77 per cent as found by the Commission's engineers, plus 4.66 per cent to cover depreciation between the dates of the former and the present valuation), leaving a balance of $1,855,447. To this balance is added land values, construction overhead cost, material and supplies, cash working capital, capital investments and going value, making the total value of the property $3,190,868.

The troubles with this exhibit are (1) it gives no consideration to the actual value of the property on April 1, 1922, and (2) the seventy per cent added to the investment cost represents the increase in cost of building material since 1913, when a large part of the investment was made prior to that date. In addition to this, the seventy per cent represents the increase in cost of building materials, but does not include increase in cost of labor, and (3) it gives no consideration to the actual physical condition of the property, or actual accrued depreciation, but uses the "straight line theoretical method" exclusively in determining accrued depreciation.

It is claimed by the city that there was $122,000 in the depreciation reserve account which was utilized by the company in help-

ing to pay for the additions and betterments to its property, and that such amount should have been subtracted from the value of the property as fixed by the Commission, in order to obtain a fair and reasonable value for rate-making purposes.

The depreciation reserve fund came from money which the customers paid for service and for that reason it belongs to the company. Where, as in this case, such funds are invested in property which is being used in the public service, the company is entitled to a reasonable return thereon. However, where such funds are not invested in property devoted to public service, the company would not be entitled to a return thereon, and, under such circumstances, it would be improper to add the amount of such funds to the value of the property upon which the utility is entitled to a return. A kindred question was decided by the United States Supreme Court in Board of Public Utility Comr's v. New York Telephone Co., 271 U. S. 23, 70 L. Ed. 808. There the telephone company's books showed a credit balance in the depreciation reserve accounts of $16,902,530. This was not set aside or kept in a separate fund, but was invested in the telephone company's plant. The Board found that the credit balance was more than was required for the maintenance of the property, and directed that $4,750,000 of that amount be used by the company to make up deficits in any year when earnings were less than a reasonable return as found by the Board. Of this order the Supreme Court said:

"It may be assumed, as found by the Board, that in prior years the company charged excessive amounts to depreciation expense and so created in the reserve accounts balances greater than required adequately to maintain the property. It remains to be considered whether the company may be compelled to apply any part of the property or money represented by such balances to overcome deficits in present or future earnings and to sustain rates which could not be otherwise sustained.

"The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time it is being used for the public service. And rates not sufficient to yield that return are confiscatory. [Citing cases.] . . . The revenue paid by the customers for service belongs to the company. The amount, if any, remaining after paying taxes and operating expenses, including the expense of depreciation, is the company's compensation for the use of its property. If there is no return, or if the amount is less than a reasonable return, the company must bear the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. [Citing cases.] And the law does not require the company to give up for the benefit

of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future. [Citing cases.]''

The opinion in this case concludes as follows:

''Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses, or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of money received for service belongs to the company, just as does that purchased out of proceeds of its bonds and stock. It is conceded that the exchange rates complained of are not sufficient to yield a just return after paying taxes and operating expenses, including a proper allowance for current depreciation. The property or money of the company represented by the credit balance in the reserve for depreciation cannot be used to make up the deficiency.''

The holding that the balance in the depreciation reserve account is the property of the company disposes of the city's contention that interest should be added to such balance.

The St. Joseph Water Company and several other water companies are owned by the American Water Works & Electric Company, Inc., a holding company. This holding company charges the St. Joseph Water Company a fee of three per cent of its gross receipts for services which it is alleged the holding company renders the water company.

The city contends that this three per cent charge amounts to a tribute levied by the holding company and the people should not be required to pay it.

The holding company's ownership of the property includes the right to control and manage it, subject, of course, to state regulation through the Public Service Commission. But it must be kept in mind that the Commission's authority to regulate does not include the right to dicate the manner in which the company shall conduct its business. The company has a lawful right to manage its own affairs and conduct its business in any way it may choose, provided that in so doing it does not injuriously affect the public. The customers of a public utility have a right to demand efficient service at a reasonable rate, but they have no right to dictate the methods which the utility must employ in the rendition of that service. It is no concern of either the customers of the water company or the Commission, if the water company obtains necessary material, labor, supplies, etc., from the holding company so long as the quality and price of the service rendered by the water company are what the law says they should be. [State

ex rel. v. Public Service Commission of Missouri, 262 U. S. 276, 288, 43 Sup. Ct. 544, 547; Citizens' Gas Co. of Hannibal v. Public Service Commission of Missouri et al., 8 Fed. (2d) 632, 634.] So the question is whether or not the holding company rendered necessary service to the water company, and if so, was three per cent of the gross receipts of the water company a proper charge therefor.

The evidence on behalf of the water company is that for the administration of the subsidiary companies, the holding company maintains (1) an efficiency department consisting of four or five technical engineers whose sole duty it is to look after the efficiency of the various plants; (2) an engineer who is an expert on the purification of water; (3) a purchasing department which buys in bulk for all the subsidiary plants the necessary material for construction work as well as for operation, and thus gets the benefit of the lowest prices; (4) a bookkeeping and auditing department which keeps all of the general books of the subsidiary companies, audits and distributes all vouchers, makes annual reports to the State Commission, makes State and Federal income tax reports and does all bookkeeping for each subsidiary company, with the sole exception of the keeping of customers' ledgers which is done in the local office; (5) an inspection and auditing department which audits and inspects the books and records of all the companies; (6) an executive-managerial department—(the plants are divided into groups and each group has a manager who in conjunction with the superintendent of each plant in his group has general charge and management of the plant); (7) a legal department consisting of two lawyers who look after all legal matters for the companies, except work which requires the attention of local counsel; (8) a financing department which finances expenditures, betterments and improvements for subsidiary companies; and (9) a treasurer and assistant treasurer who deal with bond houses and bankers and dispose of bonds more advantageously than to sell them to the public.

The three per cent charged for this service amounts in round numbers to $16,000. Mr. Biggs, the water company's chief engineer, testified that the charge of three per cent was in lieu of all officers' salaries; that no salaries were paid to officers and the highest amount paid to any employee was $400 per month to the superintendent; that from his investigation of a great many individually operated water companies, the three per cent charge in this case is less than the salaries paid to the president, vice-president, secretary and treasurer of such individually operated water companies. He further testified that by reason of the American Water Works & Electric Company filing a consolidated Federal income tax return, the St. Joseph Water Company was saved between $3,000 and $4,000 a year in Federal income tax.

The evidence offered by the water company concerning the three per cent paid to the holding company and the services rendered therefor, stands undisputed. There is no evidence one way or the other except that offered by the water company. In the face of this uncontradicted evidence we cannot say that the holding company did not render valuable service to the water company, or that the three per cent charged therefor was not a reasonable charge. The holding company had a lawful right to manage the water company in the manner shown by the evidence so long as the result of such management did not affect the rights of the public. Concerning a like question, the Supreme Court of the United States in State of Missouri ex rel. v. Public Service Commission of Missouri, 262 U. S. 276, 288, said:

"The Commission is not the financial manager of the corporation, and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses, unless there is an abuse of discretion in that regard by the corporate officers."

It is claimed that a net return of eight per cent on the value fixed by the Commission is excessive. Witness Biggs, testified to a state of facts showing that he was familiar with the sale of stocks and bonds of utilities, the price which public utilities must pay for money in the money markets of the country, and the requirements necessary for adequate protection for preferred stock dividends and for allowance for surplus and contingencies. He further testified that eight per cent would be a fair return on the value of the water company's property. This evidence was not contradicted. The only evidence offered on this subject was that offered by the water company. We are not in a position to say that a return of eight per cent is unreasonable or excessive in the face of uncontradicted evidence to the contrary. Many courts and commissions have held a return of eight per cent not excessive. In the recent case of McCardle v. Indianapolis Water Company, 272 U. S. 400, 419, the court, in discussing the reasonableness of a seven per cent return, said:

"The evidence is more than sufficient to sustain the rate of seven per cent found by the Commission. And recent decisions support a higher rate of return."

It is our conclusion that the action of the circuit court approving the order of the Commission was proper and should be affirmed. It is so ordered. All concur.