[S. F. No. 7884.   In Bank.—May 8, 1917.]

## SAN JOAQUIN LIGHT AND POWER CORPORATION (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

PUBLIC UTILITY—FIXING RATES BY RAILROAD COMMISSION—REVIEW BY COURTS—INVASION OF CONSTITUTIONAL RIGHTS.—The only ground upon which the courts may interfere with the exercise of the function of rate-fixing by the Railroad Commission of the state of California is that the action in question impairs constitutional rights. The rates will not be set aside except upon a clear showing that such rights have been invaded.

ID.—RETURN OF SIX AND ONE-HALF PER CENT NOT CONFISCATORY—ATTEMPTED ALLOWANCE OF EIGHT PER CENT.—A return of six and one-half per cent net upon the value of property devoted to public use by a corporation engaged in the business of supplying electric energy cannot be held confiscatory by the courts, as matter of law, notwithstanding the Railroad Commission, in a proceeding to fix the rates of the company, undertook to allow a return of eight per cent upon the value placed by the commission on the company's property used and useful in the business.

ID.—HYDRO-ELECTRIC COMPANY—WATER RIGHTS—VALUATION OF.—The rights of such company to divert the water of a stream to generate power by means of hydro-electric plants are property, and the utility is entitled to have their value considered in the fixing of its rates.

ID.—BURDEN ON UTILITY TO SHOW VALUE—COST OF ACQUISITION.—The burden is on the utility to show the value claimed by it of such rights, and in the present proceeding, the allowance made by the commission for such value, based upon the cost incurred in the acquisition of the rights, is sufficient under the evidence.

ID.—GOING CONCERN VALUE — DEFICITS INCURRED IN DEVELOPMENT PERIOD.—In determining the value of the property of a public utility for rate-fixing purposes, the commission is justified in excluding the item of development cost as an element of going concern value, where

the evidence shows that since the development period the utility's earnings over and above the eight per cent standard have been sufficient to balance all of the deficits of the development period, with interest thereon for the entire period.

APPLICATION for a Writ of Certiorari to review an order of the Railroad Commission of the State of California fixing the rates to be charged by a public utility.

The facts are stated in the opinion of the court.

Short & Sutherland, and Jared How, for Petitioner.

Douglas Brookman, and Max Thelen, for Respondent.

SLOSS, J.—This is a proceeding in *certiorari* to review an order of the Railroad Commission fixing the rates to be charged by the petitioner, San Joaquin Light and Power Corporation, for electric energy.

From the exhaustive and painstaking opinion accompanying the order it appears that the commission fixed the value of the petitioner's property "used and useful in electric business," at the sum of $10,054,540. On this value the commission then undertook to allow a return of eight per cent, or $804,363.20 per annum, and the sum last named was found to be a fair, just, and reasonable sum to be received by the petitioner as an annual return on the fair value of its property. Specific rates for the different kinds of service rendered by the utility were fixed in accord with this basis.

It is not claimed that the rates thus fixed will not yield to the petitioner the estimated return of $804,363.20. The contention is that in fixing the fair value of the property of the petitioner devoted to its electric business, the commission failed to make allowance for two items of property, and that, in consequence, the earnings of the petitioner will fall below the rate of eight per cent determined by the commission to be fair, just, and reasonable. These items consist of (a) the value of certain water rights, and (b) the "going concern" value of the petitioner's plant. The petitioner contends that, under the undisputed evidence before the commission, a valuation of at least six hundred and fifty thousand dollars should have been allowed for the first of these items, of $1,651,021 for the second. If these sums were added to the value placed

upon the plant by the commission, the estimated return of $804,363.20 would realize to the petitioner a net earning of 6.51 per cent instead of eight per cent.

The petitioner does not point out any evidence in the record which would force, or even justify, the conclusion that a limiting of its return to six and one half per cent on the value of its property would amount to confiscation, or, in other words, that it would, if held to so low a rate of earning, be deprived of its property without due process of law. "The function of rate-making is purely legislative in its character, and this is true, whether it is exercised directly by the legislature itself or by some subordinate or administrative body, to whom the power of fixing rates in detail has been delegated." (*Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, [53 L. Ed. 371, 29 Sup. Ct. Rep. 148].)

The only ground upon which the courts may interfere with the exercise of this function is that the action in question impairs constitutional rights. The rates will not be set aside except upon a clear showing that such rights have been invaded. (*Knoxville* v. *Knoxville Water Co., supra; Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, [15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134, 53 L. Ed. 382, 29 Sup. Ct. Rep. 192].) In view of our decision in *Contra Costa Water Co.* v. *Oakland*, 159 Cal. 323, [113 Pac. 668], it cannot be claimed that a return of six and one half per cent net upon the value of property devoted to such a public use as the one in question is, *as matter of law*, confiscatory. As we pointed out in that case, the court is not called upon to determine the rate which it, if vested with the power of fixing rates, would determine to be just and reasonable. Its right to interfere exists only where the rate-fixing body has confined the public utility to a return below that which, under the evidence in the particular case, can fairly be regarded as the lowest reasonable percentage of profit. "If the ordinance gives a rate of return which, although low, is not palpably unreasonable, the court is not to upset the action of the council because it may think a higher rate more appropriate." In the Contra Costa case we held that the evidence did not show that a return of 4.682 per cent was less than the lowest rate of return which the city council might fairly have determined to be just. The petitioner contends that because the commission fixed eight per cent as a reasonable rate of return, anything below that rate is, for the

purposes of this case, necessarily confiscatory. We cannot accept this view. The ultimate question is whether the rates fixed for electric service deprived the petitioner of its property without due process of law. The value of the property devoted to the public use, the return which should be earned upon this property, and the specific rates which will produce this return, are all elements in the problem. The final question for the court is merely whether the rates fixed will deprive the utility of its property without due process of law. The commission might have fixed rates without making a finding, in figures, of the value of the property, or of the rate of return which, in its judgment, should be realized. If it had so done, or if it had declared its purpose of allowing an earning of only six and one-half per cent, we should have been confronted with the same question that is now before us, namely, whether the rates fixed will produce a confiscation, in whole or in part, of the petitioner's property. This question must be answered upon a consideration of the evidence tending to show the lowest rate of return which the commission might reasonably have allowed. If it has not gone below this minimum, the courts are powerless, even though the rates fixed may not produce as high a return as the regulating body believed and intended.

But apart from this, we think the petitioner does not substantiate its claims with respect to either of the items of valuation alleged to have been improperly ignored.

The San Joaquin Light and Power Corporation operates a plant for furnishing electric energy in a number of counties in the San Joaquin Valley. It is the successor in interest of various corporations, the first of which was organized in 1895. Its power is generated, in part, by means of hydro-electric plants. To this end it maintains power stations upon various streams; and in connection with these stations it has acquired and owns the right to divert a portion of the flow of such streams, returning the water in due course to the streams below the point of diversion. These water rights are property, and the petitioner is unquestionably entitled to have their value considered in the fixing of its rates. (*San Joaquin etc. Co.* v. *County of Stanislaus*, 233 U. S. 454, [58 L. Ed. 1041, 34 Sup. Ct. Rep. 652].) The commission, in the present case, made an allowance for such value, based upon the cost incurred in the acquisition of these rights. The petitioner

claims that a further allowance should have been made.   Concededly, the burden is upon the public utility, in cases of this kind, to show the existence of any value claimed by it.   In the effort to establish the value of its water rights, the petitioner proceeded upon two theories.

The first of these is described in the briefs as the "comparative steam cost theory."   It is well described in the respondent's brief as "based on the assumption that the value of petitioner's water rights can fairly be determined by capitalizing, at eight per cent, the difference in the cost of service resulting from the operation of petitioner's hydraulic installations and what the cost of service would be if petitioner's electric energy were generated in a steam plant located near the oil field and burning oil."   Of this element of the case it is sufficient to say that there was substantial evidence before the commission to the effect that, at the ruling price of oil at the time of the hearing, the petitioner could generate electricity by means of steam plants at a less cost than that involved in the operation of its hydro-electric plants, after making due allowance for all charges in connection with the installation of the necessary steam plants.   According to this testimony, the advantage in favor of generation by steam would continue until the price of oil had increased by fifty per cent.   Without expressing any opinion regarding the propriety of this method of fixing the value of a water right, it is perfectly obvious that the commission did not impair the petitioner's rights, when it concluded that application of the comparative steam cost theory did not show that the water rights had any value beyond their cost.

The other theory was advanced with reference to a water right on the North Fork of the San Joaquin River.   There the corporation had constructed and was maintaining the Crane Valley Reservoir, in which it stored a portion of the water flowing in the river, in order to equalize the flow during different portions of the year.   Ultimately, the water stored found its way back into the river.   The result of this course was to decrease the flow of the river from January to June, inclusive, and to increase it from July to December, inclusive. The petitioner's diversion is subject to a prior right to the first fifteen hundred second-feet of the San Joaquin River. There are some one hundred and seventy thousand acres of land riparian to the San Joaquin River which are, or may be,

affected by the withholding and storage of water by the petitioner. The effect of the storage in the Crane Valley Reservoir is to diminish the water which would otherwise flow to these lands by 8.1 per cent in the month of March, and 2.6 per cent in the month of April. During these months irrigation upon a considerable portion of the riparian lands begins, and the use of water upon them is beneficial. The argument made is, in effect, the following: The right to store and withhold water is a detriment to these riparian lands. If that right were not already owned by the San Joaquin Light and Power Corporation, it would have to be acquired from the lower riparian owners, either by purchase or by condemnation, and the value of the right is to be measured by the price which would have to be paid for this acquisition. The difficulty with the argument is, however, that the petitioner, upon whom rested the burden of proof, failed to furnish data from which any satisfactory estimate of value could be deduced. Evidence was introduced tending to show that the one hundred and seventy thousand acres of land would be worth $65 per acre less, if the entire flow of the San Joaquin River were stopped, than they would if the flow continued undiminished. On this basis the damage which the entire acreage would suffer from total deprivation of water would amount to eleven million and fifty thousand dollars. The diminution during the months of March and April caused by the storage in the Crane Valley Reservoir averaged about five or six per cent of the total flow during these months. Hence, it is said, the lands are damaged to the extent of five or six per cent of the damage which they would suffer if all of the water were withdrawn. So estimated, the value of the water rights amounts to six hundred and fifty thousand dollars. The basis of this computation is too speculative, not to say fanciful, to be entitled to any serious weight. It assumes that the benefit derived by riparian land from the flow through or by it of a stream is in direct proportion to the volume of the stream. Such is not the fact. In point of legal right, of course, the owner of land bordering upon a stream has a right to have the usual flow of the stream unimpaired, and may enjoin any unauthorized diminution. But the amount of damage which he will suffer by the subtraction of any fractional part of the water depends upon a multitude of circumstances. In some instances the damage resulting from the removal of a part of

the flow might be very great, while in others it might be nominal. Furthermore, the petitioner's position involves the additional assumption that the withdrawal of water during two months will have the same detrimental effect upon lower lands as that which would follow a diversion for the entire irrigating season. Certainly, no fair estimate of the value of a water right can be based upon such broad and unsupported generalizations as underlie the appellant's argument here.

It is further claimed that the commission refused to make a proper allowance for "going concern" value. It is recognized by the authorities that a business in active and successful operation has a value over and above that of its component parts. (*Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, [53 L. Ed. 371, 29 Sup. Ct. Rep. 148].) The decision of the commission states that the tangible property "is being valued as property in successful operation by a going and successful utility." We see no reason to question the propriety of this declaration, unless we accept the claim of petitioner that the evidence required the inclusion of an additional sum of $1,651,021. This figure is reached by computing the company's deficit in revenue, during the development period, in eight of its fifteen districts, and extending the averages derived from such computation so as to make them apply to the entire system. The "development period," thus referred to, covers the period from the inception of the enterprise until the given district earned a net revenue of eight per cent, which is taken as the standard earning. The opinion of the commission declares, and the record sustains the statement, that since the development period the petitioner's earnings over and above the eight per cent standard have been sufficient to balance all of the deficits of the development period, with interest thereon for the entire period. Under these circumstances the commission was fully justified in excluding the item of development cost as an element of going concern value. The question is not essentially different from that before the supreme court of the United States in *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153, [59 L. Ed. 1244, 35 Sup. Ct. Rep. 811].) The following quotation is in point: "Included in going value as usually reckoned is the investment necessary to organizing and establishing the business which is not embraced in the value of its actual physical property. In this case, what may be called the inception cost of the enter-

prise entering into the establishing of a going concern had long since been incurred. The present company and its predecessors had long carried on business in the city of Des Moines, under other ordinances, and at higher rates than the ordinance in question established. For aught that appears in this record, these expenses may have been already compensated in rates charged and collected under former ordinances. As we have said, every presumption is in favor of the legitimate exercise of the rate-making power, and it is not to be presumed, without proof, that a company is under the necessity of making up losses and expenditures incidental to the experimental stage of its business." Here the evidence showed affirmatively that the company was under no such necessity.

We see no ground for interfering with the action of the commission. The order is affirmed.

Shaw, J., Melvin, J., Henshaw, J., and Angellotti, C. J., concurred.