(No. 22966

THE ILLINOIS COMMERCE COMMISSION *ex rel.* The East
St. Louis, Columbia and Waterloo Railway, Appellant,
*vs.* THE EAST ST. LOUIS AND CARONDELET RAILWAY
COMPANY *et al.* Appellees.

*Opinion filed October 14, 1935—Rehearing denied Dec. 4, 1935.*

OTTO KERNER, Attorney General, IRVIN ROOKS, LEE A. FREEDMAN, and J. R. McMURDO, for appellant.

J. L. HOWELL, VERNON W. FOSTER, and JOSEPH H. WRIGHT, (EDWARD C. CRAIG, and KRAMER, CAMPBELL, COSTELLO & WIECHERT, of counsel,) for appellees.

Mr. CHIEF JUSTICE STONE delivered the opinion of the court:

This is an appeal to review the judgment of the circuit court of St. Clair county setting aside an order of the Illinois Commerce Commission which annulled and set aside a contract entered into June 13, 1913, by the appellant, the East St. Louis, Columbia and Waterloo Railway, and the appellees, the East St. Louis and Carondelet Railway Company and the Illinois Central Railroad Company, fixing the apportionment of the cost of operating and maintaining an interlocking plant at a crossing of these lines of railroad at North Dupo, Illinois, and re-apportioning the cost of operating and maintaining that plant among those railroads.

The facts are not in dispute and are these: The Illinois Central Railroad Company, (herein called the Illinois Central,) the Missouri Pacific Railroad Company, (called the Missouri Pacific,) the East St. Louis and Carondelet Railway Company, (known as the Terminal,) and the East St. Louis, Columbia and Waterloo Railway, (known as the Waterloo,) on June 13, 1913, entered into a contract, ap-

proved by the Railroad and Warehouse Commission, predecessor to the Illinois Commerce Commission, by which it was agreed among the parties thereto that an interlocking plant be constructed and that the cost of construction, maintenance and operation thereof be apportioned, the maintenance and operation cost to be apportioned as follows: Waterloo, 55.13 per cent; Missouri Pacific, 40.38 per cent; Terminal, 4.49 per cent, with no cost to the Illinois Central. The interlocking plant consists of 78 units, the Waterloo and the Illinois Central each having 13 units, the Missouri Pacific 35 units and the Terminal 17 units. It is now in operation, and has been, under this contract, since its construction. No question is raised as to the efficiency of the interlocking plant.

The Waterloo. filed a petition with the Illinois Commerce Commission by which it alleged that for many years after making this contract petitioner was operating a large number of passenger cars over its line and had a large income; that pursuant to an order of the Commerce Commission effective June 1, 1932, its passenger service was discontinued, since which time it operates no passenger cars through the interlocking plant but its use of the plant is limited to movement of freight cars; that by reason of its discontinuance of passenger service its revenue became materially decreased; that its proportion of the cost of maintenance and operation of the interlocking plant is approximately $300 or $400 per month, which amount is so excessive and burdensome and so disproportionate to the use made by it of the plant that to require it to continue to pay such proportion will ultimately make it impossible for it to carry on the services now performed by it as a public carrier; that by reason of this changed condition and reduction in income it requested the Illinois Central and the Terminal to consent to a modification of the contract, but that they have each refused to consent thereto. The petition further represents that the public interest re-

quires that the contract be modified to the extent that petitioner be not required to pay a greater proportion of the operation of the plant than is consistent with its continuance in operation as a common carrier and the facilities used by it will warrant. The petition also alleges that the Illinois Central and Terminal are financially able to pay the greater proportion of the cost of maintenance and operation, and prays that the commission fix the percentage which each railroad should thereafter pay and that it annul and modify the contract of June 13, 1913.

The Terminal in its answer denied appellant was entitled to the relief prayed for, for the reason that (1) the cost of construction, maintenance and operation of the plant were agreed upon and reduced to writing by all the parties at the time the plant was constructed, which contract was made under the approval of the commission's predecessor; and (2) the commission had no power or authority to modify or change the terms of the contract. The Illinois Central by its answer also set up that the commission has no jurisdiction of the subject matter and is without jurisdiction to modify the contract or to grant the relief prayed; that to so abrogate, qualify or reform the terms of the contract would be in violation of contractual obligations and amount to taking its property without due process of law.

After a hearing the commission entered an order providing that the interlocking plant be taken out of service and that all roads affected, except the Illinois Central, be required to stop before reaching the crossing and flag their trains across. A rehearing was granted, and the commission thereafter entered an order that from and after April 1, 1934, the contract of June 13, 1913, be annulled, and that the cost of operating and maintaining the interlocking plant at North Dupo be re-apportioned among the parties on the basis of the number of units operated by the several railroads, and on that basis the Waterloo to pay 16.67 per cent,

the Terminal 21.79 per cent, the Missouri Pacific 44.87 per cent and the Illinois Central 16.67 per cent of such cost. Leave was granted to the parties to present to the commission a new contract covering the maintenance and operation of the plant in accordance with the order. The effect of this order, as shown by the evidence, is to reduce the Waterloo's portion of the expense of maintenance and operation of the plant so as to amount to a saving to it of approximately $2400 per year. The circuit court of St. Clair county set aside the order of the commission, and the Waterloo brings the cause here for review.

Counsel have submitted briefs in which numerous cases are cited. In none of them, however, is the question here presented directly decided, nor has such question heretofore been presented to this court. Proceedings before the commission are statutory. The authority for any order of the commission must be found in the act. It is not claimed that the contract was not fairly or understandingly made or that the public is interested in the method used in the operation of the interlocking plant. The evidence shows the plant to be adequate to insure public safety in the operation of the trains of these railroads across this intersection. The only claimed basis for the order of the commission is, that unless this saving of $200 per month be made to the Waterloo there is reason to fear that it will not be able to continue its service as a common carrier. The record shows that all of the railroads interested in this lawsuit were for the period of 1931 and 1932 operating at a deficit, that of appellant in 1931 amounting to $31,713 and in 1932 to $21,518, a reduction of something over $10,000 due to discontinuance of passenger service. The $200 per month saved to the Waterloo by this order amounts to slightly over nine per cent of the total deficit of that road for the year 1932. The Illinois Central showed a deficit in 1931 of $3,500,000 and the first eight months of 1932 $4,600,000. The Missouri

Pacific showed a deficit for the first eight months of 1932 of $7,832,000.

The first question to be considered is whether the Commerce Commission had jurisdiction and power to enter an order annulling the contract of June 13, 1913. Appellant argues that power and authority to modify agreements between railroads, where such agreements adversely affect the public interest, have been delegated by statute, and that this is a situation calling for the exercise of such authority. The commission derives its power solely from the statute and has none except it be by statute expressly conferred upon it. Where jurisdiction is conferred by statute all facts necessary to the exercise of such jurisdiction must affirmatively appear from the record. (*Lambdin* v. *Commerce Com.* 352 Ill. 104; *People* v. *Holmes,* 348 id. 204; *People* v. *Wells,* 291 id. 584.) Counsel for appellant admit that the Public Utilities act does not in specific language confer upon the commission jurisdiction to amend contracts such as the one under consideration in this case, but argue that by certain sections of that act, and other acts hereinafter considered, jurisdiction is conferred. The statutes referred to are sections 8, 32, 41, 50, 51, 57 and 58 of the Public Utilities act, the Railroad Crossing act and the Railroad Safety act. Sections 8, 32 and 51 of the Public Utilities act (Cahill's Stat. 1933, chap. 111*a,* pars. 23, 47, 66,) require railroads to provide adequate service. As we have stated, it is conceded here that the interlocking plant is adequate. Those sections do not apply to the question before us. Sections 57 and 58 (ibid, pars. 76, 77,) relate to highway grade crossings and in no way refer to maintenance and operation of interlocking plants.

The sections of the Public Utilities act upon which reliance is chiefly based are 41 and 50. The first paragraph of section 41 authorizes the commission, when it shall find the rates or other charges or classifications unreasonable,

discriminatory or preferential, to determine the just, reasonable and sufficient rates and charges and to fix the same by order. The second paragraph of this section is as follows: "The commission shall have power, upon a hearing, had upon its own motion or upon complaint, to investigate a single rate or other charge, classification, rule, regulation, contract or practice, or any number thereof, or the entire schedule or schedules of rates or other charges, classifications, rules, regulations, contracts and practices, or any thereof of any public utility, and to establish new rates or other charges, classifications, rules, regulations, contracts or practices or schedule or schedules, in lieu thereof," etc.

Counsel for appellees argue that section 41 relates solely to rate questions and rate contracts and has no application to managerial functions or contracts as to operation costs between two or more utilities where the subject matter of the contract is not included within the subject of rates. Counsel for appellant, on the other hand, argue that because the language gives power to the commission to investigate a single rate or other charge, classification, rule, regulation, contract or practice, or any number thereof, or the schedule of rates or other charges, classifications, rules, regulations, contracts and practices, it has power to substitute reasonable for unreasonable contracts relating to all matters, whether primarily a rate question or not; that all questions of public service affect rates, and so it was the intention of the legislature to give the commission power to change any contract which might ultimately affect the rate which it would be necessary for the utilities to charge. It must be conceded, on reading the entire section, that the only contracts specifically included were those having to do with rates and rate contracts or service and that contracts having to do with the managerial functions of railroads are not expressly included. It may be taken as true that all contracts may be said to indirectly affect rates

which the utility must charge to show operation at a profit, since any contract which re-acts unfavorably on the net income of the railroad may be said to affect the question whether it is receiving net income sufficient to justify continuance of service without raising rates. Unless it can be said that jurisdiction is given to the commission to reform and modify any and all contracts of a common carrier affecting its net income, we are unable to see how it can be said that section 41 confers the authority on the commission to annul and modify a contract relating to the apportionment of cost of operating and maintaining an interlocking plant because that contract injuriously affects the net income of one of the contracting parties. It may be further observed that if the commission has power to release a railroad from one contract concerning operating expense to the extent of reducing its obligations thereunder, it may so annul and modify any contract between common carriers.

Appellant's counsel also argue that by the Public Utilities act, as well as the Railroad and Warehouse acts, the General Assembly intended that the expense of maintaining and operating an interlocking plant constructed to protect an existing crossing be reasonably apportioned among the railroads forming the crossing. They cite section 50 of the act as supporting this contention. That section provides that whenever the commission finds that additions, extensions, repairs or improvements are required in any existing plant, equipment or apparatus or other physical property of one or more public utilities, it may, under the procedure there detailed, bring about such changes, and in so doing it shall notify the utilities affected that such new structures or changes have been ordered and that the same shall be made at the joint cost of the utilities, "whereupon the said public utilities shall have such reasonable time as the commission may grant within which to agree upon the apportionment or division of cost of such additions, ex-

tensions, repairs, improvements or changes or new structure or structures, which each shall bear." That section also provides that in event of a failure on the part of the railroads to agree, within the time fixed, upon the apportionment of such cost, the commission shall have power, on further hearing, to apportion such cost. This section, as its language clearly indicates, has to do with additions, improvements, repairs or new structures and provides an opportunity to the utilities to agree upon the apportionment of the cost. There is no question of additions or extensions of an interlocking plant here. This contract has to do with maintenance and operation expense of such a plant. No such matter is included in the provisions of section 50. There is not here a failure on the part of the utilities affected to agree upon the cost involved in constructing this interlocking plant, as the contract here attacked makes just such provision. We are of the opinion that the power sought to be here exercised by the commission is not granted by the sections of the act referred to.

Counsel for appellant also refer to the Railroad Crossing act, amended May 25, 1907. (Cahill's Stat. 1933, chap. 114, par. 123.) Under that act a junior railroad desirous of effecting a crossing with another railroad line already constructed shall bear the entire expense of the construction of such crossing, together with the cost of installing such interlocking or other safety appliance as shall be required. This act can be of no assistance to appellant here, and section 50 of the Public Utilities act in effect declares that the Railroad Crossing act was not repealed. The Railroad Public Safety act (Smith's Stat. 1933, chap. 114, par. 68, p. 2292,) has no application here. It has to do with regulations for safety after a railroad crossing has been effected. Here the only question in the case is the right of the commission to apportion the cost of maintenance and operation of the plant notwithstanding the parties affected have contracted concerning it.

Appellant by its counsel, however, contends that the commission, by reason of its general supervision and plenary jurisdiction over the whole field of service of all utilities, may properly modify an agreement to preserve the adequacy of public service. That this general statement of the powers of the Commerce Commission is correct has been frequently stated by this court. (*Tjardes* v. *New York, Chicago and St. Louis Railroad Co.* 357 Ill. 162; *Chicago Motor Coach Co.* v. *City of Chicago,* 337 id. 200, and cases there cited.) The deduction counsel see in these cases, however, is not justified by their text. As pointed out in *City of Chicago* v. *Commerce Com.* 356 Ill. 501, the power of the commission to require separation of grades and to apportion the cost thereof notwithstanding a city ordinance which had been accepted, arises out of special delegation by the General Assembly of the power over the subject matter of that contract. It was there held that the Public Utilities act took away from municipalities the power to contract with railroads concerning the cost of grade separation. The power to enter into the contract before us is expressly given to the railroads by the Public Utilities act. So in *Tjardes* v. *New York, Chicago and St. Louis Railroad Co. supra,* where the utility was required to construct a switch-track. Jurisdiction to do so is specifically placed within the jurisdiction of the commission by the Public Utilities act. The question involved in the *Chicago Motor Coach Co. case* was whether the Illinois Commerce Commission or the city of Chicago had jurisdiction over the use of streets by motor vehicles. These cases do not aid the contention that the commission may annul contracts such as the one before us. Other cases cited by counsel for appellant are to be distinguished on the ground that the court was there considering questions of express grant of power to the commission and do not present the issue here raised.

It must not be forgotten that railroads, though subject to public control in matters affecting public rights, are still private corporations, with the right to contract among themselves concerning their method of doing business, and that where their rights, as between themselves, are not impressed with public obligations they may still control and manage their own business. The Public Utilities act does not in any proper sense constitute the public a general manager of railroads. (*Interstate Commerce Com.* v. *Chicago and Great Western Railroad Co.* 209 U. S. 108.) The reading of the Public Utilities act shows that it is the purpose of the General Assembly that in a matter such as the apportionment of cost of construction and operation of plants, devices or physical structures the utilities affected shall have opportunity to agree between or among themselves. This was done here and the contract approved by the commission's predecessor. The order of the commission in this case cannot in anywise affect the safety of the operation of the roads or the adequacy of its plants or physical structures. There is no inadequacy of public service shown or claimed on the part of any of the railroads affected.

Nor are we impressed with the view of the commission that the saving of $200 per month would prevent a cessation of utility service on the part of the appellant. Discontinuance of service on the lines of any of these railroads is not here.

We are of the opinion that no authority exists in the commission to make the order entered by it, and the circuit court of St. Clair county was right in setting it aside.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*