[S. F. Nos. 17952, 17953.   In Bank.   Feb. 28, 1950.]

THE PACIFIC TELEPHONE AND TELEGRAPH COM-
PANY (a Corporation), Petitioner, v. PUBLIC UTILI-
TIES COMMISSION OF THE STATE OF CALI-
FORNIA et al., Respondents.

Arthur T. George, Eugene M. Prince, Eugene D. Bennett and Pillsbury, Madison & Sutro for Petitioner.

Everett C. McKeage, Roderick B. Cassidy, Boris H. Lakusta, Hal F. Wiggins, J. Thomason Phelps and Harold J. McCarthy for Respondents.

Ray L. Chesebro, City Attorney (Los Angeles), Roger Arnebergh, Assistant City Attorney, Dion R. Holm, City Attorney (San Francisco), John W. Collier, City Attorney (Oakland), Archer Bowden, Assistant City Attorney, and Emuel J. Forman for Real Parties in Interest.

TRAYNOR, J.—In two petitions for writs of review the Pacific Telephone and Telegraph Company attacks two virtually identical orders of the Public Utilities Commission prescribing the terms on which Pacific may contract with the American Telephone and Telegraph Company for certain services. Although the two orders grew out of separate rate proceedings, they involve identical issues and may be treated as one.

American owns 87.93 per cent of the capital stock of Pacific. The commission found that American dominates Pacific and that the contract between the two, whereby Pacific paid one per cent of its gross receipts for the services of American, was not in fact a contract but an arbitrary exaction from Pacific by its controlling parent company. It therefore entered its orders specifying the terms upon which Pacific could continue its service contract with American. They provide: "It Is Hereby Further Ordered that, as applied to its California intrastate operations, applicant, the Pacific Telephone and Telegraph Company, hereafter, shall pay to the American Telephone and Telegraph Company, for services rendered by it or any of its affiliates to applicant, no more than the reasonable cost incurred in the rendition of such services or the reasonable value of said services, whichever is the lesser. That in determining the reasonable value of any services rendered, consideration shall be given, among other things, to what it would reasonably cost applicant to perform such service with its own organization. Services rendered to applicant, which, in the judgment of the Commission, are not reasonably required by applicant shall not be paid for by applicant. Neither applicant nor any officer, agent or servant of applicant, by any device whatsoever or under any pretense or guise, directly or indirectly, shall commit any act or engage in any conduct which shall be calculated to circumvent or evade the intent of this order.

"It Is Hereby Further Ordered that applicant shall file with this Commission, bimonthly, a verified report showing for the immediately preceding two-calendar-month period all payments made by applicant to the American Telephone and Telegraph Company for services rendered to applicant by said

American Telephone and Telegraph Company and/or any of its affiliates, together with an itemization of said services and the amount paid by applicant for each type of service rendered, such report to be filed not later than forty (40) days after the close of the period which it covers. Said verified report shall show, for each type of service rendered, the total cost incurred by the American Telephone and Telegraph Company or its affiliates in the rendition of said service to applicant, and the payment therefor by applicant on an allocated basis, segregated as to company-wide, total California and California intrastate operations. The first report shall be for the months of January and February, 1949 and shall be filed on or before April 9, 1949.

"It is Hereby Further Ordered that, as applied to its California intrastate operations, the amount of $2,250,000, on an annual basis, shall be adopted by applicant as the base and starting point for the program and procedure prescribed by this order and applicant shall be entitled to pay, on an annual basis, to American Telephone and Telegraph Company said amount for services rendered to applicant by American Telephone and Telegraph Company and/or its affiliates pursuant to the license contract; provided, however, that said amount shall be adjusted to a lesser or greater amount as the facts and circumstances may warrant, but, in no event, shall applicant pay more than $2,250,000 on an annual basis without first seeking and receiving the authority of this Commission so to do."

When these orders were entered the difference between the amount Pacific was to pay on the basis of one per cent of gross revenue as provided in the license contract and the amount allowed by the commission on an allocated cost basis was approximately $250,000. The commission was willing to allow payment of $2,250,000; one per cent of gross revenue was approximately $2,500,000. In these proceedings Pacific is not challenging the power of the Public Utilities Commission to disallow, for rate fixing purposes, payments to American that it finds excessive.* Pacific contends, however, that

*Pacific does not concede that disallowance of any part of the payments was proper; it does not attack the disallowance, however, believing that the court would not consider it in reviewing a rate-fixing order unless the rate finally fixed was confiscatory. (See, *Market Street Ry. Co.* v. *Railroad Com.*, 24 Cal.2d 378, 405 [150 P.2d 196]; *American Toll Bridge Co.* v. *Railroad Commission*, 12 Cal.2d 184, 193-194 [83 P.2d 1]; *San Joaquin Light & Power Corp.* v. *Railroad Commission*, 175 Cal. 74, 76-77 [165 P. 16].)

the commission has no jurisdiction to prescribe the terms on which it may contract with American.

It is settled that commissions have power to prevent a utility from passing on to the ratepayers unreasonable costs for materials and services. (*United Fuel Gas Co.* v. *Railroad Com.*, 278 U.S. 300, 320 [49 S.Ct. 150, 73 L.Ed. 390] ; *Chicago etc. Railway Co.* v. *Wellman,* 143 U.S. 339, 345-346 [12 S.Ct. 400, 36 L.Ed. 176].) To the extent that utilities secure materials and services necessary to their business through contracts made by arms-length bargaining in the open market, the contract price is ordinarily accepted as the proper cost to the utility of the materials and services. Since the advent of the holding company, however, that both controls and provides services for a network of operating utilities, new problems in regulation have arisen. When services are rendered to an operating utility by an affiliated company that owns a controlling fraction of the stock of the operating company, the safeguards provided by arms-length bargaining are absent, and commissions have been vigilant to protect the rate-payers from excessive rates reflecting excessive payments by operating companies to their parents. (See, *Western Distrib'g. Co.* v. *Public Serv. Com.*, 285 U.S. 119, 126-127 [52 S.Ct. 283 ; 76 L.Ed. 655] ; *Dayton Power & Light Co.* v. *Public Util. Com.*, 292 U.S. 290, 295 [54 S.Ct. 647, 78 L.Ed. 1267].) Many state legislatures, not satisfied that the indirect control of payments between affiliated utility corporations through rate regulation was adequate to protect the consumer and investor from the possible abuses that could arise out of contracts between the affiliated corporations, enacted statutes specifically granting to their commissions power to regulate payments under such contracts. (See, 49 Harv.L.Rev. 957, 982-989.) Similar powers over gas and electric utilities have been given to the Securities and Exchange Commission by the federal Public Utilities Holding Company Act of 1935 [49 Stats. 838, 15 U.S.C.A. § 79 et seq.]. (See, 49 Harv.L.Rev. 957, 989-999.) California, however, has not expressly granted such power to the commission, and it is therefore necessary to determine whether the power may be fairly implied from the powers that have been granted.

The primary purpose of the Public Utilities Act [Stats. 1915, p. 115, as amended, 2 Deering's Gen. Laws, Act 6386] is to insure the public adequate service at reasonable rates without discrimination. (*Pacific Tel. etc. Co.* v. *Eshleman,* 166 Cal. 640, 663 [137 P. 1119, Ann.Cas. 1915C 822,

50 L.R.A. N.S. 652] ; *Atchison etc. Ry. Co.* v. *Railroad Com.*, 173 Cal. 577, 582 [160 P. 828, 2 A.L.R. 975] ; *Southern Pac. Co.* v. *Railroad Com.*, 13 Cal. 2d 89, 118 [87 P.2d 1055].) The act grants to the commission broad regulatory powers, which may conveniently be divided into two classes. The commission has been given broad powers to regulate the relationship of the utility to the consumer; thus it can determine the services that must be provided by the utility and the rates therefor. It has also been given certain specific powers to regulate the manner in which the utility provides the required services to safeguard the utility's ability to serve the public efficiently at reasonable rates; thus the commission must approve the sale or encumbrance of operative property necessary or useful to the utility in the performance of its duties (§ 51), and it must approve the issue of securities and may specify the manner in which funds so raised may be spent. (§ 52.) The act does not, however, specifically grant to the commission power to regulate the contracts by which the utility secures the labor, materials, and services necessary for the conduct of its business, whether such contracts are made with affiliated corporations or others.

▪ The commission contends that jurisdiction may be implied from the provisions of section 48 of the act empowering the commission to prescribe uniform systems of accounts. This power, however, relates, not to what transactions are to be made, but to how they are to be recorded. It enables the commission to keep informed of the financial management of the utility and increases the effectiveness of its other powers. It cannot reasonably be held, however, to include by implication the power to prescribe the terms and conditions of any transaction that will be reflected in the accounts.

▪ The commission contends that jurisdiction may be implied from the provisions of section 52 of the act requiring commission approval of securities issues. It bases this contention on the premise that, by approval of the securities that Pacific issues, it provides Pacific with a defense to any action a shareholder might bring to prevent abuse of his interest by the management, and that therefore it must have the power to protect minority shareholders from abuses arising out of contracts made with the majority shareholder, American. There is nothing in section 52, however, to indicate that commission approval of securities issues operates to deprive minority shareholders of remedies they would otherwise have. Section 52 provides the extent to which the commission may

control expenditures under its terms, and this control is limited to the use to be made of funds raised by securities issues. Pacific, however, is not making these payments from funds so raised.

Section 32 of the act provides that "Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rates . . . charged or collected by any public utility . . . or that the rules, regulations, practices or contracts, or any of them, affecting such rates . . . are unjust, unreasonable, discriminatory or preferential, or in anywise in violation of any provision of law . . . the commission shall determine the just, reasonable or sufficient rates . . . practices or contracts to be thereafter observed and in force, and shall fix the same by order as hereinafter provided. . . ." Section 35 of the act provides for similar powers over practices of a utility relating to the services it renders. Section 31 of the act provides that "The railroad commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in the state and to do all things, whether herein specifically designated or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." It is contended that the grants of regulatory power under these sections give the commission jurisdiction to determine the terms on which Pacific may contract with American and that the license contract has so much effect on the rates and services of Pacific that it may be regulated directly by the commission.

Almost every contract a utility makes is bound to affect its rates and services. Moreover, the question whether a contract or practice is reasonable is one on which, except in clear cases, there is bound to be conflicting evidence and considerable leeway for conflicting opinions. The determination of what is reasonable in conducting the business of the utility is the primary responsibility of management. If the commission is empowered to prescribe the terms of contracts and the practices of utilities and thus substitute its judgment as to what is reasonable for that of the management, it is empowered to undertake the management of all utilities subject to its jurisdiction. It has been repeatedly held, however, that the commission does not have such power. "And, finally, it may not be amiss to point out that the devotion to a public use by a person or corporation of property held by them in ownership does not destroy their ownership and does not vest title to the property in the public so as to justify, under the

exercise of police power, the taking away of the management and control of the property from its owners without compensation, upon the ground that public convenience would better be served thereby, or that the owners themselves have proven false or derelict in the performance of their public duty. Any law or order seeking to do this passes beyond the ultimate limits of the police power, however vague and undefined those limits may be.'' (*Pacific Tel. etc. Co.* v. *Eshleman,* 166 Cal. 640, 665 [137 P. 1119, Ann.Cas. 1915C 822, 50 L.R.A.N.S. 652] ; *Atchison etc. Ry. Co.* v. *Railroad Com.,* 173 Cal. 577, 583 [160 P. 828, 2 A.L.R. 975] ; *Hollywood C. of C.* v. *Railroad Com.,* 192 Cal. 307, 310 [219 P. 983, 30 A.L.R. 68] ; *Southern Pac. Co.* v. *Railroad Com.,* 13 Cal.2d 89, 118 [87 P.2d 1055].)

█ It might, for example, be wise business judgment to divert profits from the payment of dividends to finance expansion into fields that the utility has not theretofore entered. In the absence of an enabling statute meeting the requirements of due process, however, the commission cannot require management to make such choices. (*Hollywood C. of C.* v. *Railroad Com.,* 192 Cal. 307 [219 P. 983, 30 A.L.R. 68].)

█ Similarly, in the absence of a statute granting the commission the power to fix minimum rates to prevent injurious competition, both this court and the commission have recognized a ''zone of reasonableness'' within which a carrier can fix its own rates. It is for the management to decide what rates within that zone are likely to prove most beneficial to the carrier. (*Southern Pac. Co.* v. *Railroad Com.,* 13 Cal.2d 89, 118-119 [87 P.2d 1055].)

█ Again, there is great public interest in the relations between labor and management, for wages invariably affect rates, and disputes over them or other matters are bound to affect services. Accordingly there has been considerable state and federal legislation to diminish economic warfare between labor and management. In the absence of statutory authorization, however, it would hardly be contended that the commission has power to formulate the labor policies of utilities, to fix wages or to arbitrate labor disputes.

In other jurisdictions the courts have generally held in interpreting statutes essentially like that of California that the commission's control over contracts affecting rates and services is limited to regulation of contracts that directly affect the service the rate-payer will receive at a particular rate.

(*Illinois Commerce Commission* v. *East St. Louis & C. Ry. Co.*, 361 Ill. 606 [198 N.E. 716, 719] ; *Philadelphia City Passenger Ry Co.* v. *Public Service Commission*, 271 Pa. 39 [114 A. 642, 647-648].) Thus, the division of a city into various zones by a transit company to fix fares directly affects rates. Contracts whereby the rate drops as consumption increases or whereby the liability of a carrier for loss or damage is limited to a declared value of the goods shipped in consideration of a lower rate directly affect rates. Such contracts and practices affect the relationship of the utility to the consumer, not its relationship to those who supply it with materials and services.

It is contended, however, that the license contract between Pacific and American is not like ordinary contracts through which utilities secure materials and services; that because Pacific and American are affiliated corporations and because American dominates Pacific, the commission may prescribe the terms of the contract between them.

In the absence of express statutory authority it has generally been held that a commission's control over contracts between affiliated corporations is limited to disallowance of excessive payments for the purpose of fixing rates. (*Philadelphia City Passenger Ry. Co.* v. *Public Service Commission*, 271 Pa. 39 [114 A. 642, 647-648] ; *State ex rel. City of St. Joseph* v. *Public Service Commission*, 325 Mo. 209 [30 S.W.2d 8, 14] ; *Lone Star Gas Co.* v. *Corporation Commission of Oklahoma*, 170 Okla. 292 [39 P.2d 547, 553-554] ; see, also, *Columbus Gas & Fuel Co.* v. *Public Utilities Commission*, 292 U.S. 398, 414-415 [54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403] ; 49 Harv.L.Rev. 957, 985; 48 Yale L.J. 1015, 1020.) In the past the California commission has recognized similar limitations upon its powers. "All this Commission is able to do is to regulate the amount that is to be allowed in operating expenses as payment to the parent company for services rendered, and this amount should be in direct proportion to the value of the services received." (*In re Southern California Telephone Co.*, 21 C.R.C. 274, 282.) In *San Diego* v. *San Diego Consolidated Gas & Electric Co.*, 39 C.R.C. 261, where the operating company was admittedly dominated by its parent, the commission disallowed part of the intercompany payments in fixing new rates, but did not order the cessation of such payments. In *In re Pickwick Stages System*, 31 C.R.C. 746, the commission under section 52 of the act limited the amount an operating company could pay its holding company out of

funds derived from a new securities issue for equipment manufactured by the holding company, but did not prevent larger payments, requiring only that anything exceeding the limits it set be charged to surplus.

The commission has thus long been conversant with the problems presented by affiliated corporations in the field of utility regulation. The instant case is apparently the first in which it has attempted to prescribe the terms and conditions of contracts between affiliates. The policy of the commission in the past not to prescribe the terms of contracts between affiliated corporations is consistent with the provisions of the Public Utilities Act. There is nothing in the act to suggest that the contracts of public utilities affecting rates and services are subject to greater regulation when they are between affiliated corporations than when they are not.

Moreover, there is no basis for such broad jurisdiction in the principles governing the disregard of a corporate entity. In the present case the commission is not disregarding completely the separate entities of Pacific and American. It does not seek to exercise regulatory jurisdiction directly over American, under the theory that American is in fact the operating utility subject to its jurisdiction. It recognizes that American provides Pacific with valuable services for which Pacific should pay. It would disregard only the terms of the contract by which it is determined how much Pacific should pay for the services it receives, and thus substitute its judgment for that of the management as to the reasonable amount and the method of its computation. Thus the commission is seeking to disregard the separate corporate entities, not to exercise more effectively its existing jurisdiction, but to extend its jurisdiction.

By contracting with American, Pacific is not attempting to evade the jurisdiction of the commission. It is not making these payments from funds derived from securities issues, or attempting to evade the commission's regulatory powers over the expenditures of such funds. (See, *In re Pickwick Stages System*, 31 C.R.C. 746, 753-754.) Nor is it attempting to evade the prohibition of section 1500 of the Corporations Code against the impairment of capital by the payment of illegal dividends disguised as contract payments. Under sections 60 and 75 of the act the commission is empowered to stop illegal practices of utilities. If by the device of a contract for services, American were exacting excessive pay-

ments that impaired Pacific's capital and thus weakened its ability to serve the public, the commission could disregard the separate corporate entities and treat the excessive payments as an illegal dividend. (*Ohio Central Telephone Corp.* v. *Public Utilities Com'n.*, 127 Ohio St. 556 [189 N.E. 650] ; see, Ballantine on Corporations (Rev. ed.) § 142, p. 330; *cf.*, *Western Canal Co.* v. *Railroad Commission*, 216 Cal. 639, 652 [15 P.2d 853].) We do not have such a case before us, however, for the payments under the license contract are not impairing Pacific's capital or affecting its ability to serve the public. Moreover, in fixing Pacific's rates the commission may disallow expenditures that it finds unreasonable, thus insuring that any excessive costs will be met from Pacific's profits. The effect of the payments on rates and services is no greater than in any other case where the commission and management disagree on the reasonableness of an expenditure, and the management concludes that it is good business judgment to make such payments from its profits despite the fact that it cannot recoup them from its rate payers.

In developing a nationwide telephone service, American has adopted the legally sanctioned practice of conducting its local operations through subsidiary operating companies. It employs a method it considers reasonable in apportioning the costs of the services rendered by it to its subsidiaries among them. The contract embodying that method cannot be differentiated from other contracts by which utilities secure labor, materials, and services, except on the theory that the judgment of management is suspect on the reasonableness of expenditures in contracts with affiliated corporations as it is not in other contracts. There is no public policy against affiliated corporations, however, and the commission can treat them differently only to the extent the Legislature so provides or to the extent that they are used as a device to defeat the exercise of powers the commission has been granted. The Public Utilities Act is silent on the question of affiliated corporations, and only the Legislature can properly decide whether they present such dangers of abuse that the commission should have broader regulatory powers over them than it now has.

The order in S.F. 17952 and those parts of the order brought here for review in S.F. 17953 are annulled.

Gibson, C. J., Edmonds, J., Schauer, J., and Spence, J., concurred.

SHENK, J.—I dissent.

Under the plenary power granted to the Legislature by section 22 of Article XII of the Constitution it was certainly competent by appropriate legislation to confer upon the commission the authority to supervise contractual relationships such as existed between the Pacific Telephone and Telegraph Company and its owner and corporate master, the American Telephone and Telegraph Company, especially insofar as contracts affecting rates are concerned. The Legislature has effectively conferred such power on the commission by section 32 of the Public Utilities Act. By that section the commission was expressly authorized to find any existing contract affecting rates to be unreasonable. This power could be exercised as to expenditures under existing contracts in excess of payments properly allowable as part of the rate base. But more pertinently, that section also expressly authorized the commission to determine the reasonableness of contracts affecting rates thereafter to be observed by the utilities under its jurisdiction. It is this power that the commission is seeking to exercise by the orders under review; and in this respect it is reinforced by the general provisions of section 31.

It may be assumed that the commission would be without power to prescribe in advance the terms and conditions of a contract and payments thereunder entered into between the petitioner and another in the normal course of business in which both parties are acting independently and at arm's length. But the contract here required to be observed by the petitioner is not of that character. The independence of action which is essential in the execution of contracts known to the law is not present. The real question as I see it is whether the commission has exceeded its jurisdiction in making the particular orders and not, as petitioner contends, whether it was wholly without power to make them.

The facts do not show the exercise of broader regulatory power than the commission possesses. Nor is this a case where the petitioner is deprived of the management and control of its property. We have here nothing more than a regulation guarding against future excessive payments affecting rates which could otherwise be imposed upon the petitioner without its voluntary bargaining participation. By its order the commission is not exceeding its jurisdiction but is merely making its jurisdiction effective. In my opinion the particular contract here ordered to be observed is just such a contract as

is contemplated by our law and sound public policy to be subject to supervision by the commission in the manner proposed. I would affirm the orders.

CARTER, J.—I dissent.

The question here presented is not complex. The Pacific Telephone and Telegraph Company, an operating communications utility in California, is completely dominated and controlled by the American Telephone and Telegraph Company, a New York corporation, whose main function is to hold stock in and furnish various services to local telephone operating corporations throughout the country, most of which are controlled by it through stock ownership. American enters into purported license fee contracts with its numerous affiliates, including Pacific, under which the affiliates pay a percentage of their gross revenue for the services to be rendered by American. It is conceded that in fixing rates for Pacific, our Public Utilities Commission may ignore the percentage basis of compensation under those contracts and allow only so much as is the reasonable value of such services or the cost thereof to American. The sole question is whether the commission has authority to approve or disapprove such contracts. I believe there can be no doubt of such power. It arises (1) by necessary implication, and (2) by the wording of the Public Utilities Act.

On the first proposition, there are several important considerations which must be weighed. It has been aptly said: "Contracts with operating companies range in subject from a single activity to a comprehensive scheme giving virtual domination over the policies of the subsidiary utility. But the services, even when enumerated at length, are commonly described in such general terms that no clear picture of those actually rendered can be obtained from examination of the contracts . . .

"The profits accruing from the servicing relationship invite inquiry into the possibilities of abuse inherent in the holding company structure. In the control possessed by the holding company, often exercised through common officers or interlocking directorates, lies the power to dictate terms and the consequent danger of unreasonable exactions. The modern super-holding company system itself furnishes a strong incentive for such exactions. Control over operating companies through a relatively small investment may be effected by the

interposition of subholding units, the financing of which can be facilitated by the issuance of bonds and preferred stock . . .

"Exploitation of operating companies is detrimental to both consumer and investor. Although it is seemingly immaterial to the consumer whether the parent obtains income through high service charges or through dividends resulting from more economical operations, in fact excessive charges, unless disallowed by public utility commissions, may adversely affect him. Overpayments for management services result in the swelling of operating expenses. When resorted to as a screen for profits beyond a fair return, they can prevent a rate reduction, or, by so minimizing the return that only small profits or none at all are shown, can result in an increase. And the sums exacted may be so great as to impair service to the public through lack of funds for maintenance or additions. Furthermore, overcharges for construction or engineering services, reflected in the operating company's capital account, have a dual effect upon rates: they broaden the base upon which a fair return must be earned, and enhance costs of operations by enlarging the amount annually charged to depreciation, thereby increasing the rate required to yield an adequate return . . .

"The disallowance of operating expenses increases the net operating revenue for the purposes of determining the fairness of the return in a rate case. This increase tends to subject the utility to lower rates, with the possible consequence of an ultimate decrease in income that may force a comparable reduction in expenditures." (49 Harv.L.Rev. 957, 959, 978-981, 986.)

It has also been said: "It may be asked why should the commission, as representative of the consumers be concerned over a 'raid on the treasury of the operating utility.' Directly the consumers will not be affected whether the utility is solvent or insolvent. Their rates are based upon a fair return on a fair value and it should not matter to them who gets it. Unfortunately, this argument overlooks the simple facts that an insolvent utility has no credit with which to obtain the capital necessary for the continuous expansion of service demanded from a utility under modern conditions and that operation of a utility by receivers seems usually to be thought to result in higher operating expenses than would ordinarily be incurred." (*Regulation of Utility Contracts,* 20 St. Louis L. Rev. 1, 58.) Those considerations point up the vital impor-

tance of the power of the commission to disapprove such contracts as a part of rate regulation and of the necessity that the ability of the utility to serve the consumers be not impaired. I cannot believe that the Legislature intended to leave the commission impotent to cope with those conditions. It may be that some measure of protection is afforded by the power to refuse to recognize the license fee contract when fixing rates, but having that power, it of necessity follows that they may lock the door before the horse is stolen. If they may affect the utility management indirectly by subsequent action, surely they may take precautionary measures in advance. The Alabama Utilities Commission has pertinently observed in this connection: "We cannot conceive that it will be contended that a Commission is without authority to halt a raid on the treasury of the operating utility on the plea that it has no right in law to manage the property. From our point of view, it is not an assertion of management, but rather an assertion of reasonable control over practices which the Commission has a right to prevent and should prevent before the injury has been done if it is possible for us to arrive there in time." (See, *Re Southern Bell Tel. & Tel. Co.*, P.U.R. 1932E, 207.) Certainly it was intended that the commission would have the power incident, and indeed vital, to protect the consumer from improvident waste of funds to the detriment of the service. They surely have the power to accomplish directly that which they may do by indirection. While it may be that there is no showing in the case at bar that the payments to American here involved will seriously jeopardize Pacific's consumer service capacity, that is not necessary, for the situation is so fraught with potential and inherent dangers that this court should not overrule the commission's judgment that preventive advance action is necessary. It must be remembered that these license fee contracts are not true contracts made at arm's length or on an open market. They are between corporations, one of which is controlled by the other. As such they are subject to suspicion and therefore present dangerous potentialities. It seems plainly obvious to me that if payments for such services are regularly supervised by the commission, it will not only inure to the consumer's benefit, but will also put the utility in the advantageous position of knowing where it stands, thus escaping the risk of making excessive payments which will not be allowed in its rate base. That the commission has such implied power is squarely declared by the Public Utilities Act. "The railroad com-

mission is hereby vested with power and jurisdiction to supervise and regulate every public utility in the state and to do all things, whether herein specifically designated or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.'' (Public Utilities Act, Stats. 1915, p. 115, § 31; 2 Deering's Cal. Gen. Laws, Act 6386.)

Secondly, it is clear that section 32 of the Public Utilities Act, quoted in the majority opinion, must be interpreted as empowering the commission to regulate the purported contracts here considered. The literal wording thereof requires it.

Fear is expressed that if the instant contract is subject to approval by the commission, all other contracts or expenditures of a utility may be scrutinized in advance. Whether or not that fear is well founded is not necessary to consider. I say only that the license fee purported contract between the operating utility and its dominating father, Pacific and American, may be so treated. There is a clear difference between such arrangements and others. They are not true contracts made at arm's length. They are definitely subject to suspicion and potent with possibilities adverse to the interests of the consumers.

It must be conceded that the contract here in question was executed by officials of Pacific who were elected by American as the principal stockholder of Pacific and owe their allegiance to American. To say that such a contract is beyond the regulatory power of the Public Utilities Commission, when it may endanger the ability of Pacific to serve its customers, is a step backward in the public utility regulation and may open the door to abuses seriously detrimental to those dependent upon service from public utilities. While I think it is clear that the Public Utilities Act expressly empowers the commission to regulate such contracts in the public interest, there can be no question that it was the intention of the Legislature to confer upon the commission all the power necessary to protect the public interest. This, the majority overlooks in placing a strict and strained construction upon the provisions of the act in order to arrive at the conclusion reached.

I would deny the writs and affirm the orders under review.

Respondent's and Real Parties in Interest's petitions for a rehearing were denied March 27, 1950. Shenk, J., and Carter, J., voted for a rehearing.